# **EXHIBIT G**

# Richardson v. Shell Canada Ltd.

Alberta Judgments

Alberta Court of Queen's Bench

Judicial District of Calgary

N.C. Wittmann C.J.Q.B.

Heard: January 20, 2012.

Judgment: March 12, 2012.

Docket: 1101 16107

Registry: Calgary

[2012] A.J. No. 280   |   2012 ABQB 170   |   535 A.R. 200   |   70 Alta. L.R. (5th) 105   |   2012 CarswellAlta 374   |   213 A.C.W.S. (3d) 619

IN THE MATTER OF a Request from the United States District Court for the District of Kansas for International Judicial Assistance in re: Motor Fuel Temperature Sales Practices Litigation Between Richardson, Patrick, Westbrook & Brickman LLC, Applicants, and Shell Canada Ltd., Respondent

(49 paras.)

## Case Summary

**Civil litigation — Civil evidence — Letters rogatory or letters of request — Application by US court for an order requiring respondent Shell Canada to produce a corporate representative to appear to answer questions upon oral examination in actions for breach of contract and unjust enrichment for failing to disclose or adjust price of gasoline for temperature expansion of the motor fuel allowed in part — Proposed questions were overly broad and burdensome on respondent — Respondent to produce representative for questioning before an Official Court Reporter limited to the authentication of 115 key documents.**

Application pursuant to a letter of request for international judicial assistance by the District Court of Kansas for an order requiring the respondent Shell Canada to produce a corporate representative to appear to answer questions upon oral examination concerning a number of topics arising from Multi-District litigation comprising 51 actions. The plaintiffs in the actions wanted to certify a class action of retail motor fuel consumers who purchased gasoline or diesel fuel from the defendants without a disclosure or adjustment for temperature expansion of the motor fuel. It was claimed that the defendants were liable under various state law theories including consumer protection, breach of contract, unjust enrichment and civil conspiracy. The plaintiffs could not obtain the evidence sought from Shell Canada without the letter of request. The letter or request stated that information regarding adjusted temperature control use in Canada was relevant to the issues before the Kansas Court to be determined at the trial, including the defendants' contention that Temperature Adjusted Sales were impossible or impractical. Shell Canada argued that the request was overly broad and that the letter of request was not in substance to gather evidence for trial, but rather for discovery.

HELD: Application allowed in part.

 A Shell Canada representative was to be produced for oral examination, limited to the authentication of 115 key documents. Prior to producing the Shell Canada representative, copies of those documents will be provided to Shell Canada through its counsel in these proceedings. Two weeks after the provision of those copies, a Shell Canada representative was to appear before an Official Court Reporter for oral examination. A close examination of the

letter of request revealed a request for an extremely broad scope of oral examination. The proposed issues regarding Shell Canada's knowledge of temperature of motor fuel at its retail stations and issues related to temperature adjustment over 21 years were too broad and wide ranging. It would place an undue burden on a corporate representative of Shell Canada and would lead to the applicant arguing that a number of representatives of Shell Canada were necessary to properly and truthfully answer the broad scope of inquiry put.

## Statutes, Regulations and Rules Cited:

Alberta Evidence Act, RSA 2000, c. A-18, s. 56(1) <LEGISLAITON/> Alberta Rules of Court Rule 6.24, Rule 13.46

Canada Evidence Act, R.S.C. 1985, c. C-5, s. 43, s. 46(1)

## Counsel

Ms. Kimberly Johnston, Mr. David Hendricks, for the Applicants.

Mr. Bryan C. Duguid, for the Respondent.

**Reasons for Judgment**

**N.C. WITTMANN C.J.Q.B.**

**Introduction**

1  A letter of request for International Judicial Assistance ("the LOR") from the United States District Court for the District of Kansas was sent to the Court of Queen's Bench of Alberta, in Calgary, requesting that this Court direct and order the Respondent, Shell Canada Ltd. ("Shell Canada"), to produce a corporate representative to appear before me or a competent person authorized by me, to answer questions upon oral examination concerning a number of topics arising from Multi-District Litigation ("MDL") comprising approximately 51 lawsuits.

2  The Defendants in the MDL include Equilon Enterprises LLC, D/B/A/ Shell Oil Products US, Motiva Enterprises LLC, Shell Oil Company, and Shell Oil Products Company LLC (collectively known as "Shell US"). Those Defendants opposed the granting of the LOR before the Kansas Court. The MDL consists of Plaintiffs who seek certification of a class of similarly situated retail motor fuel consumers who purchase gasoline or diesel fuel from the Defendants without a disclosure or adjustment for temperature expansion of the motor fuel. It is claimed that the Defendants are liable under various state law theories including consumer protection, breach of contract, unjust enrichment and civil conspiracy.

**Details of the LOR**

3  The United States District Court for the District of Kansas certified and consolidated two class actions, originally brought in the District of Kansas and transferred to the MDL with respect to the liability and injunctive relief aspects of the Plaintiffs' claims for unjust enrichment and violation of Kansas consumer protection laws and civil conspiracy as to some of the Defendants, which issues are to be the subject of a trial.

4  The Plaintiffs sought to depose a Shell Canada corporate representative through a direct request to counsel for the Shell US Defendants, without success and sought to depose a corporate representative of the Shell US Defendants on topics related to the enactment and an implementation of legislation in Canada, permitting the use of

Automatic Temperature Compensation ("ATC") equipment. The corporate representative of Shell US was not knowledgeable on most of the relevant topics. The Plaintiffs could not obtain the evidence sought from Shell Canada without the LOR.

**5**  The LOR states that information regarding ATC use in Canada is relevant to the issues before the Kansas Court to be determined at the trial, including the Defendants' contention that Temperature Adjusted Sales are impossible or impractical; the Plaintiffs' claim that there is an unjust enrichment by selling non-temperature adjusted fuel in warm climates and temperature adjusted fuel in cold climates; the Plaintiffs' claim the Defendants' practice of selling non-temperature adjusted fuel is unfair, unlawful, deceptive and fraudulent under State Consumer Protection Laws; the Defendants' argument that the installation of ATC equipment is cost prohibitive; the Defendants' argument that the installation of ATC equipment provides little or no value to consumers; the Defendants' argument that the installation of ATC equipment will result in consumer confusion; and the Defendants' contention that the installation of ATC equipment does not provide a consistent value in fuel purchased.

**6**  The LOR refers to the Plaintiffs seeking a corporate representative of Shell Canada to give deposition testimony "narrowly limited in scope" to address the enactment and implementation of ATC legislation in Canada and the continuing use of ATC equipment and in addition, indicates that the Plaintiffs' intend to use the deposition for the purpose of "potentially authenticating Shell Canada documents produced by Shell US Defendants."

**7**  There is a "Conclusion and Requested Evidence" section in the LOR, whereby the Chief Judge of the United States District Court for the District of Kansas, the Honourable Kathryn Vratil, asks that this Court make an Order that a Shell Canada corporate representative shall appear to answer questions on oral examination, concerning a number of topics pertaining to the issues determined relevant, as above. Also contained in the materials before me, is Exhibit A to the Letters Rogatory, the Affidavit of David Hendricks; Exhibit B, the Order of James P. O'Hara, a United States Magistrate Judge, as well as legal memoranda in support of and in opposition to, the granting of the LOR.

**Position of the Parties**

**8**  The Applicant Law Firm is representing the Plaintiffs in the MDL. At the hearing before me, the parties represented to this Court as follows:

    (a)   Shell Canada

**9**  Shell Canada takes the position that the effect of the LOR, if enforced, is to compel Shell Canada to participate in the "true purpose" of the Applicants' request, which is to "obtain broad ranging discovery evidence with the hope that some relevant evidence might possibly surface.

**10**  In support of this argument, Shell Canada's counsel put forward the Draft LOR which was put before the United States Magistrate and later the Chief Judge of the District Court. He argued that the United States District Court merely "rubber stamped" the Applicants' request and refers to a number of legal memoranda, seeking deposition discovery evidence, as opposed to trial evidence.

**11**  On a practical basis, Shell Canada indicates that it cannot possibly bring forward one corporate representative who could properly speak to all of the areas for deposition that the Applicant asserts are "specific", when they are in fact overly broad and wide ranging areas. In the submission of Shell Canada, they are also neither relevant nor material, in some cases.

    (b)   The Applicant

**12**  During the oral hearing, it became apparent that the Applicant was narrowing the scope of its request, notwithstanding the wording of the LOR. The Applicant has argued, that even if some of the evidence requested is

for discovery purposes and not trial, that this is not foreclosed by Canadian case authority. In addition, the Applicant claims, as cited in case authority discussed below, that the doctrine of equitable discovery is applicable to this situation.

13   It is clear, from both the oral hearing and the written materials in front of me, that a number of Shell Canada documents have been produced in the MDL and there is a request that a Shell Canada representative be produced for authentication purposes. The Court asked what that meant. Mr. Hendricks, US counsel for the Applicant, who was permitted to make representations to the Court, indicated that authentication meant that the documents were dispatched as addressed and received by the purported recipient. Also, Mr. Hendricks conceded that he wanted 115 key documents authenticated, already produced in the MDL, either by Shell Canada or through Shell US.

14   The Court will expand further on the position of the parties, in the discussion of the applicable law.

**Applicable Law**

15   The parties have cited the following applicable statutes, rules and case law. *Canada Evidence Act*, R.S.C. 1985, c.C-5, s.46; *Alberta Evidence Act*, R.S.A. 2000 c.A-18, s.56; *Rules of Court*, Alta. Reg. 124/2010, Rule 6.24; *United States District Court, Middle District of Florida v. Royal American Shows Inc.*, [1982] 1 S.C.R. 414; *CSI Wireless LLC v. Harris Canada Inc.*, 2003 ABQB 610; *R. v. Zingre*, [1981] 2 S.C.R. 392; *Presbyterian Church of Sudan v. Talisman Energy Inc.*, 2005 ABQB 920; *Interclaim Holdings Ltd. v. Down*, 2000 CanLII 28245 (ABQB); *Norwich Pharmaceutical Co. et. al. v. Customs and Excise Commissioners,* [1973] 2 All E.R. 943; *Alberta Treasury Branches v. Leahy*, 2000 ABQB 575; *Gulf Oil Corporation v. Gulf Canada Limited, Gulf Minerals Canada Limited*, [1980] 2 S.C.R. 39.

**Applicable Statutes**

16   As indicated, the provisions of the *Canada Evidence Act* and *Alberta Evidence Act*, were cited by both parties. The *Canada Evidence Act*, s. 46(1) states as follows:

> 46.(1) If, on an application for that purpose, it is made to appear to any court or judge that any court or tribunal outside Canada, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to that matter of a party or witness within the jurisdiction of the first mentioned court, of the court to which the judge belongs or of the judge, the court or judge may, in its or their discretion, order the examination on oath or interrogatories, or otherwise, before any person or persons named in the order, of that party or witness accordingly, and by the same or any subsequent order may command the attendance of that party or witness for the purpose of being examined, and for the production of any writings or other documents mentioned in the order and of any other writings or documents relating to the matter in question that are in the possession or power of that party or witness.

17   The provision in the *Alberta Evidence Act*, cited by both parties, is s. 56(1), which states as follows:

> 56(1) When, on application to the Court of Queen's Bench, it is made to appear that a court or tribunal of competent jurisdiction in a foreign country has by commission, order or other process authorized the obtaining of the testimony, in or in relation to any action, suit, proceeding or inquiry pending in or before the foreign court or tribunal of a witness out of its jurisdiction and within the jurisdiction of the Court of Queen's Bench, the Court may order the questioning of the witness before the person appointed and in the manner and form directed by the commission, order or other process.
>
> (2)   The Court by that order or by a subsequent order,
>
>   (a)   may command
>
>     (i)   the attendance of a person named in the order for the purpose of being questioned, or
>
>     (ii)   the production of any writing, document or thing mentioned in the order,

      and

    (b)  may give all directions with regard to the time and place of the questioning and all other matters connected with it that seem proper.

(3)  The order may be enforced and any disobedience to it punished in like manner as the case of an order made by the Court of Queen's Bench in an action pending in the Court.

(4)  A person whose attendance is so ordered is entitled to the same allowances and payment for expenses and loss of time as on attendance at a trial in the Court of Queen's Bench.

(5)  A person questioned under the commission, order or other process

    (a)  may object to answer and may refuse to answer any questions that the person would be entitled to object to or refuse to answer in an action pending in the Court of Queen's Bench, and

    (b)  shall not be compelled to produce at the questioning any writing, document or thing that the person could not be compelled to produce at the trial of such an action.

(6)  When the commission, order or other process or the instruction of the court accompanying it directs that the person to be questioned affirm or be sworn, the person appointed to question him or her has the authority to administer the oath to him or her or take his or her affirmation.

**18**  The *Alberta Rules of Court*, Rule 6.24 was also cited by the Applicant. That rule states as follows:

> 6.24 If a judicial authority in another jurisdiction requests or authorizes a request to be made to the Court for the Court's assistance in obtaining evidence from a person in Alberta for use in a court or other proceeding outside Alberta, the Court may make any order that it considers appropriate, including any one or more of the following:
>
>     (a)  requiring a person to attend for questioning, under oath, which may take the form of cross-examination;
>
>     (b)  requiring a person to produce records;
>
>     (c)  requiring a transcript of the questioning to be prepared;
>
>     (d)  specifying the manner in which questioning is to be conducted.

**19**  The case law authority can be divided into two areas. The first deals with how Canadian courts have responded to LORs in the past and sets forth some general principles to be applied. The second area has to do with so called *Norwich* Orders and the doctrine of equitable discovery. Dealing first with case authority with respect to how our Courts have responded to LORs in the past, the *Royal American Shows* case from Alberta, has been cited to detail considerations of comity that supported the lending of assistance to the United States Court. Comity was stated to be an overriding policy concern, subject to a number of qualifications. The Judgment of the Court, delivered by Chief Justice Laskin, cited s. 43 of the *Canada Evidence Act*, reviewed a number of authorities and at paragraph 34-36 stated as follows:

> 34.  Miller J. fully endorsed the considerations of comity that supported the lending of assistance to the United States Court, subject only to the established guidelines set out in various Canadian decisions for meeting Canadian requirements. These, in his view, included the following: (1) Was the evidence required for trial or for discovery? (2) Was the testimony relevant? (3) Was the inquiry of a scope that would not be allowed in Alberta? (4) Were the documents requested described or defined with adequate precision? As to (1), Miller J. was satisfied that the evidence was required for trial; as to (2), subject to a question concerning certain material picked up as a result of intercepted telephone conversations, relevancy was a matter for the commissioner taking the evidence (should an order be made) or for the United States Court, or perhaps for both but it was not for him; as to (3), there was no offence to this guideline; and as to (4), the material requested in Ex. 1(a), (b), (c) and (d) and the tapes

mentioned in Ex. 2 (subject to certain limitations to be discussed), could be sufficiently described to satisfy that guideline.

35. I wish to add a word on the respondents' contention that the evidence was required for discovery and not for trial. The prosecution's position was clear that the evidence was directed to the trial alone, but in accordance with the governing procedure, the accused were entitled to advance notice of the documents to be tendered at trial and could view them. There was no question hence of seeking information by way of discovery as ordinarily understood, and the accused could not properly assimilate the process, intended for their advantage, to something akin to discovery.

36. I am content to support Miller J. in his observations on the relevant guidelines that he chose to follow, subject to consideration of the position of tapes of certain intercepted telephone conversations.

This passage was cited by Watson J. (as he then was) in *CSI Wireless*. In *Zingre*, the Supreme Court of Canada again considered the issue and in a decision delivered by Dickson J. (as he then was), laid down a general proposition that Canadian courts will only order an examination for the purpose of gathering evidence to be used at a trial, but this general proposition was modified, noting that s. 43 of the *Canada Evidence Act* did not distinguish between pretrial and trial proceedings. Dickson J. continued at paragraph 22:

> ... It merely speaks of the foreign court or tribunal "desiring" the testimony of an individual "in relation to" a matter pending before it. I do not think it would be wise to lay down an inflexible rule that admits of no exceptions. The granting of an order for examination, being discretionary, will depend on the facts and particular circumstances of the individual case. The Court or Judge must balance the possible infringement of Canadian sovereignty with the natural desire to assist the courts of justice of a foreign land. It may well be that, depending on the circumstances, a court would be prepared to order an examination even if the evidence were to be used for pre-trial proceedings. An illustration is the case of *Kirchoffer v. Imperial Loan and Invt. Co.* (1904), 7 O.L.R. 295, 30 W.R. 390. An action had been brought in Manitoba against a corporation by a former employee. The plaintiff had sought to examine the former manager of the defendant corporation on discovery, but the individual was a resident of Ontario and he refused to comply. The plaintiff then sought an order from the Ontario Court under the provisions of The Ontario Evidence Act and Canada Evidence Act compelling the former manager to submit to discovery. It was argued that the order should be refused, as the statute did not contemplate examinations for discovery. Chancellor Boyd rejected the argument and ordered the examination for discovery [p. 296]:
>
>> The Imperial Statute 19 & 20 Vict. ch. 113, sec. 1, relates to witnesses; ours extends to parties as well as witnesses: R.S.C. 1886, ch. 140.
>>
>> The order asked is to examine Dr. Kertland, a manager of the defendants, for discovery. As such officer he is a *quasi* party, or stands for the person to be examined for the corporation who is the defendant. I think the statute applies on a liberal construction to such a case, and grant the order as upon an *ex parte* application.
>
> 23. In *Re Isler* (1915), 34 O.L.R. 375, 25 D.L.R. 845 (H.C.) the Ontario High Court ordered the examination of an individual based on letters rogatory from a "juge d'instruction" in France. The function of the "juge d'instruction" is described by René David in English Law and French Law (1980) at p. 65 as follows:
>
>> The role of a *juge d'instruction* is not to pronounce if the accused is guilty or not guilty; it is only to direct and supervise the procedure of enquiry led by *ministère public* and it is to decide, at the close of such enquiry, if it is appropriate or not to remand the accused for trial before a criminal Court ... The accused will only appear before such Court if, in the mind of *juge d'instruction*, there is a probability that he is guilty.
>
> 24. It is clear that the testimony was for use at a pre-trial inquiry, yet the court ordered the examination.
>
> 25. In *Geneva v. Comtesse*, [1959] O.J. No. 703, supra, the Ontario High Court received letters rogatory from a "juge d'instruction" in Switzerland. The Court refused to order the examination on another ground, with no reference being made to the fact that the testimony was for use at a pre-trial inquiry.

> Where there is no limitation or infringement of Canadian sovereignty, and where the facts are such that justice can only be done by ordering the examination, the court should not refuse to make the order solely because the testimony relates to a pre-trial proceeding.

**20**  In the *Presbyterian Church* case, LoVecchio J. of this Court, considered *Zingre* and *Gulf Oil Corp.* and noted that the request from the United States District Court for the Southern District of New York that remained outstanding for him to consider, was "open ended" without any limits to the scope of the examination. After the hearing, LoVecchio J. granted the applicants leave to obtain a revised LOR from the United States District Court, specifying the areas of evidence for each of the proposed witnesses and after another appearance, received a revised LOR. It is apparent from this decision that LoVecchio J. was reluctant to "unilaterally narrow the scope of the letters of request in a manner proposed by the Applicants": paragraph 17.

**21**  The revised LOR raised issues that LoVecchio J. dealt with, namely whether public policy should override comity and whether there was an entitlement for commission evidence, and whether the Court could grant an Order against former employees of Talisman, when they were not parties to the proceedings. The latter LoVecchio J. styled as a "very technical argument only". None of those kinds of issues are present in this case.

**22**  Turning to the case law authority on equitable discovery, the Applicant has referred to *Interclaim Holdings*, *Norwich Pharmaceutical Co.* and *Alberta Treasury Branches*. In *Interclaim Holdings*, a series of orders against various financial institutions and municipalities were granted, requiring disclosure of all information relevant to the business assets or holdings of individual and corporate Defendants. The orders were made *ex parte*. In addition, an action was commenced against the alleged wrong doers and an Anton Piller Order and Mareva Injunction was issued *ex parte*.

**23**  Kent J. cited *Norwich Pharmaceutical Co.*, which held there could be discovery against a person who had committed no wrong or was a mere witness, because discovery itself was an equitable remedy which survived the introduction of the Rules of Practice. The availability of that kind of order has not been abrogated by the *Alberta Rules of Court*. Kent J. in so holding, went on to discuss under what circumstances such an order should be limited to the freezing of the assets to prevent removal from the jurisdiction and not tracing, although she stated that the distinction might sometimes be difficult to determine.

**24**  In *Alberta Treasury Branches*, a number of *ex parte* orders were issued permitting the tracing of funds and production of documents from third-party financial institutions. The Defendants move to set aside the *ex parte* orders on the basis that *Alberta Treasury Branches* had no right to the *ex parte* orders. Mason J. decided that the remedy was not precluded by the *Alberta Rules of Court* and that *Norwich Pharmaceutical Co.* relief has been granted in varied situations. These authorities demonstrate that the Equitable Bill of Discovery has survived the *Alberta Rules of Court*, that the *Alberta Rules of Court* are not therefore exhaustive in the sense that they occupy the field. In deciding whether to exercise the Court's discretion to permit third party discovery, many of the factors are similar to those enumerated in the case law relating to the exercise of discretion by a Court when considering an LOR.

**Analysis**

**25**  I do not find the reference to equitable discovery helpful. In the case of an LOR, as presented here, it does not add to the analytical framework when a Canadian Court is asked to make an order in response to an LOR. I will thus confine my analysis to the established principles that Canadian Courts have adhered to in responding to an LOR.

**26**  The case authority is quite clear that in assessing the proper response to an LOR, the Court will consider the following factors:

1.  Whether the evidence sought to be obtained is relevant;

2. Whether the evidence sought to be obtained is necessary for a trial or for discovery;

3. Whether the evidence is otherwise available through some other source;

4. Whether any documents requested have been identified with reasonable precision;

5. Whether there is any public policy reason to refuse the request;

6. Whether the LOR requests an activity which would place an undue burden on a proposed witness or witnesses, having regard to the nature of the testimony requested.

**27**  This Court is not reluctant to narrow the scope of the LOR, nor is it inclined to require a revised LOR before it considers the merits of what is being requested. It does not seem practical to do so in this case, whatever the advisability of that process might have been in *Presbyterian Church*. The details of the LOR, in terms of what the Applicant describes as a narrow specific examination, which Shell Canada insists is overbroad, are before me. Thus, the Court is compelled to first consider the "Conclusion and Requested Evidence" details in the LOR, as set out below, and as modified by any concessions made by counsel during the hearing. The request is that according to the "proper and usual process of the Court of Queen's Bench of Alberta", that it do the following:

(A) direct and order Shell Canada to produce a corporate representative to appear before you or some competent person authorized by you, at a time and place fixed by you, to answer questions upon oral examination concerning these topics:

1. Shell Canada's corporate relationship to its parent companies, specifically limited to the relationship as it concerns retail motor fuel operations.

2. Shell Canada's relationship with related United States companies, including the Shell US Defendants, specifically limited to the relationship as it concerns retail motor fuel operations.

3. Shell Canada's knowledge of temperature of motor fuel at its retail stations and issues related to temperature adjustment, specifically limited to:

    a. the effect temperature has on the amount of energy dispensed to consumers in motor fuel dispensed at its retail stations;

    b. the effect temperature has on the volume and price of motor fuel dispensed to consumers at retail stations;

    c. efforts to address the effects that temperature has on the energy content, volume or price of motor fuel;

    d. consideration of, and decisions concerning, the installation of ATC equipment on motor fuel dispensing pumps at retail stations;

    e. the extent to which motor fuel dispensing pumps equipped with ATC equipment deliver a consistent quantity of energy to retail consumers;

    f. the factors, environmental or otherwise, that affect the temperature of motor fuel sold to consumers at its retail stations; and

    g. the identity and type of all documents that evidence the information sought by this topic.

4. All studies and analyses performed by Shell Canada regarding the effect of the temperature of motor fuel as it related to its purchases or sales of motor fuel, specifically limited to:

    a. the results or conclusions of any such study or analysis;

    b. how the results and/or conclusions of any such study or analysis affected Shell Canada's motor fuel purchasing or sales practices; and

    c. the identity and type of all documents that evidence the information sought by this topic.

5. Shell Canada's retail motor fuel operations from January 1990 to the present, specifically limited to:

      a. profit margin on the retail sale of motor fuel both before and after Shell Canada installed ATC equipment at retail motor fuel stations; and

      b. the identity and type of all documents that evidence the information sought by this topic.

6. Shell Canada's knowledge, information and communications related to the use of ATC for retail motor fuel sales in Canada from January 1990 to the present, specifically limited to:

      a. the extent to which Shell Canada sells motor fuel at retail in Canada using ATC equipment;

      b. when Shell Canada first began selling motor fuel at retail in Canada using ACT equipment;

      c. why Shell Canada sells motor fuel at retail in Canada using ATC equipment;

      d. the extent and nature of Shell Canada's involvement in establishing, supporting, or implementing regulations related to the use of ATC at motor fuel retail stations;

      e. communications with Measurement Canada regarding the use of ATC equipment at retail and any benefits of ATC in Canada;

      f. communications with consumers regarding the use of ATC equipment at retail and the benefits of ATC in Canada; and

      g. the identity and type of all documents that evidence the information sought by this topic.

7. Shell Canada's communications from January 1990 to the present with any person involved in retail motor fuel operations in the United States, including but not limited to the Shell US Defendants, specifically limited to:

      a. the subject matter of communications regarding motor fuel temperature as it related to ATC equipment or retail motor fuel temperature adjustment;

      b. the identity and type of all documents that evidence the information sought by this topic, and

(B) appoint an Official Court Reporter in the Province of Alberta (or a delegate provided that person is an Official Court Reporter in Alberta) as the Commissioner before whom the evidence at the requested oral examination is taken;

(C) direct and order that such Shell Canada corporate representative be cross-examined by counsel for the plaintiffs and, if appropriate, by counsel for the Shell US Defendants on matters relevant to the topics identified herein;

(D) direct and order that the Shell Canada corporate representative's testimony be recorded verbatim by the Official Court Reporter, committed to writing and videotaped on electronic media for use at trial; that any document marked as an exhibit be made part of such record; that the Official Court Reporter authenticate the deposition taken on the examination and such documents marked as exhibits; and that the transcript and videotape and any exhibits thereto be sent under cover duly sealed and addressed to United Stated counsel for plaintiffs: David Hendricks, Richardson, Patrick, Westbrook & Brickman, LLC, 1017 Chuck Dawley Boulevard, Mount Pleasant, SC, 29464, U.S.A.

**28** Referring to *Zingre*, although the question may be properly asked whether the evidence sought is for discovery or trial, it seems to me that this inquiry misses a somewhat fundamental point. That is, that the two are not mutually exclusive. Rule 32(a) of the United States Federal Rules of Civil Procedure, details the use of depositions at a trial. One of the conditions, where a deposition may be used, is where the party offering the deposition could not procure the witness's attendance at the trial.

**29** In any event, *Zingre* stands for the proposition that the *Canada Evidence Act* does not restrict the use to evidence gathered for the purpose of trial only. Nor does any such restriction exist in the *Alberta Evidence Act*. That is an issue here, as indicated, with the Applicant taking the position the evidence is sought for use at trial and the Respondent taking the position that what the Applicant seeks is a discovery in terms of a fishing expedition. The

point is, failing to show conclusively that the evidence is sought only for trial purposes is not fatal. It is a factor to be considered along with all of the other factors.

**30** Secondly, it is to be noted that in some of the case authority in Canada, what is relevant is to be left to the United States Court and ought not to be considered by the Court receiving the LOR. I cannot subscribe to this concept in any strict sense. A reviewing Court receiving a LOR cannot help but look at the evidence sought through the lens of relevancy. That is what we do. That is not to say that refined definitions of relevancy, within the meaning of the rules of procedure in a different jurisdiction, should not be respected and deferred to in a case where those distinctions matter. In the view I take of this case, any such distinction will not affect my decision.

**31** Earlier, I indicated that the position of Shell Canada was that the request was overly broad and that the LOR was not in substance to gather evidence for trial, but rather for discovery. The Applicant on the other hand, argued that there is a narrow and specific scope to the request. With respect to the scope or breadth of the LOR, I agree with Shell Canada. Calling something that isn't, is, does not make it so. A close examination of the LOR reveals a request for an extremely broad scope of oral examination.

**32** Given the alleged specificity of the LOR, I will refer to the details of it. Under the heading (A), the request is to produce a corporate representative of Shell Canada to answer questions upon oral examination concerning "these topics": Shell Canada's corporate relationship to it's parent companies, specifically limited to the relationship as it concerns retail motor fuel operations; Shell Canada's relationship with related United States companies including the Shell US Defendants, specifically limited to the relationship as it concerns retail motor fuel operations. Stopping here, the word "relationship" means a connection, association or involvement. What would be the connection, association or involvement of Shell Canada that is not already known by the deposition of the Defendants in the case? It could only be a connection, association or involvement that has not been disclosed by the Defendants through the discovery process contained in the United States Federal Rules of Civil Procedure. At best, the deposition of a Shell Canada corporate representative for this purpose, is to test the credibility of the Shell US Defendants. In Alberta, questions going solely to the credibility of a witness are not permitted upon oral discovery or questioning, but of course, would be permitted at a trial.

**33** Under Item 3 of "these topics", the request is to have the corporate representative give Shell Canada's "knowledge" of temperature motor fuel at its retail stations and issues related to temperature adjustment. Then comes the modifier, "specifically limited to." A close examination of the entirety of No. 3 indicates a broad and wide ranging area of examination. "Knowledge" means an acquaintance with facts, truths or principles, from a study or investigation, or based on familiarity or experience. The seven sub-headings that purport to "specifically limit" the topics are wide ranging. They include the words "the effect", "efforts to address the effects", "consideration of and decisions concerning", "the extent", "the factors", "the identity and type of all documents of evidence information sought by this topic". This inquiry is far too broad. It would place an undue burden on a corporate representative of Shell Canada and indeed would lead Shell Canada down the pathway where the Applicant would argue that a number of representatives of Shell Canada were necessary to properly and truthfully answer the broad scope of inquiry put.

**34** Paragraph 4 requests "all studies and analysis performed by Shell Canada regarding the effect of the temperature of motor fuel" with a number of sub-headings. In this regard, it is to be remembered that the Applicant narrowed the scope of its request for documents to the "115 key documents" sought to be authenticated by a Shell Canada representative. Therefore, the request in the LOR, in paragraph 4 has been narrowed by the oral argument of the Applicant.

**35** Paragraph 5 contains a request which spans over 21years, namely from January 1990 to the present, and asks that a corporate representative testify as to "Shell Canada's retail motor fuel operations but specifically limited to the profit margin on the retail sale of motor fuel before and after Shell Canada installed ATC equipment and the identity and type of all documents that evidenced the information sought by this topic.

**36** Twenty-one years is an expansive length of time. The date or dates when Shell Canada installed ATC

equipment at retail motor fuel stations may be one date certain, or phased in. That evidence is not before the Court. The concept is that the profit margin before and after installation, is relevant. It is said, both in the LOR and in argument before me, relevant to the defence of the Shell US Defendants, that the installation of ATC equipment at retail motor fuel stations would unduly affect the profit margin.

**37**  The relevancy of this issue, is at best, remote. There may be many factors that affect the profit margin at a retail motor fuel station. Location, overhead, fixed costs, variable costs, fuel pricing, other revenue may be different from one area of the United States to another. Likewise in Canada.

**38**  As stated earlier, this Court is aware of some admonitions in the case law, that it is not for a Canadian Court to decide what is relevant in the United States litigation. Different standards of "relevance" are mandated by the jurisprudence in the United States. Indeed, different standards for discovery or questioning in advance of a trial are evident between jurisdictions in Canada. In Alberta, even discovery evidence must be "relevant and material": *Alberta Rules of Court* 5.2. By definition, the evidence is relevant and material only if the answer to a question or the record or information can reasonable expect to significantly help determine one or more of the issues raised by the pleadings or help ascertain evidence that could reasonably expect to significantly help determine one or more of the issues raised in the pleadings. The key word is "significantly". Whatever may be the law under the United States Federal Rules of Procedure, as the LOR now stands, if the Defendants' contention is that the installation of an ATC device, at a retail station, is "cost prohibitive" it would seem to me that what is directly relevant is: how much would it cost to install?

**39**  Paragraph 6 again refers to "Shell Canada's knowledge, information and communications" relative to the use of ATC for retail fuel sales in Canada for the 21 year period, but then purports to "specifically limit" the inquiry to a number of issues, seven in number, including a request for the identity and type of all documents that evidence the information sought by this topic. To comply with this request would be overly burdensome for Shell Canada. However, some of the questioning that is relevant can be recast as follows:

1. When did Shell Canada first begin selling motor fuel in Canada using ATC equipment?
2. Is the sale of motor fuel at retail in Canada using ATC equipment universal, among all Shell Canada retail motor fuel stations?

**40**  Paragraph 7 asks for all Shell Canada's communications for the last 21 years with any person involved in fuel operations in the United States but not limited to the Shell US Defendants. Again, I find the request to be overly broad and burdensome.

**41**  The order to be made by the Court will require a Shell Canada representative to be produced for oral examination, limited to the authentication of the 115 key documents, which have already been disclosed to the Applicant, as indicated. Prior to producing the Shell Canada representative, copies of those documents will be provided to Shell Canada through its counsel in these proceedings. Two weeks after the provision of those copies, a Shell Canada representative will appear before an Official Court Reporter for oral examination.

**42**  Also, prior to the appearance, the process will be discussed between counsel. For example, this Court is aware that under the United States Federal Rules of Civil Procedure, Rule 30, answers to questions generally may not be refused but rather, may be objected to and then answered. This is contrary to the procedure in Alberta and indeed, so far as this Court is aware, throughout the rest of Canada. So the process here will be that objected to questions shall be brought back before this Court for a determination as to whether the question need be answered. In this regard, that motion can be brought back before any judge of this Court in my absence, if necessary.

**43**  In the meantime, I admonish counsel involved to conduct their examination, no sooner than two weeks and no later than four weeks, from the date the 115 documents are provided to Shell Canada's counsel. In addition, the Shell Canada representative is to inform himself with respect to the authenticity of the 115 documents. As stated in oral argument, the Applicant wishes to "authenticate" the documents. This means proving the documents are

genuine; that they in fact were authored or received by the purported authors or recipients. The Shell representative will also inform himself to enable him to answer the 2 questions posed in paragraph [39].

**44**  It is to be noted that the LOR makes its request pursuant to Rule 28(b) of the Federal Civil Judicial Procedure and Rules. There has been an offer to make the offices of local counsel available for the examination, that is Docken & Company, 900, 800 - 6th Avenue, S.W., in Calgary. Unless otherwise agreed upon between counsel, the examination will take place there. The LOR also requests that the Official Court Reporter be appointed as the Commissioner before whom the evidence at the requested oral examination is taken. The Official Court Reporter is a person appointed by the Minister, pursuant to the *Recording of Evidence Act*, R.S.A. 2000, c.R-7.5. At this juncture, the Official Court Reporter will not be appointed as a Commissioner, but as the person before whom the evidence at the requested oral examination is taken. That person is obliged to perform duties required under the *Alberta Rules of Court* assigned by the Court, pursuant to Rule 13.46(1) and will perform the duties enumerated therein accordingly.

**45**  The process to be followed, as requested in the LOR, is that the Shell Canada representative be cross-examined by counsel for the Plaintiffs, which this Court will restrict to one counsel and, if appropriate by counsel for the Shell US Defendants. As the LOR indicates that the evidence given is needed for a trial, the United States counsel can decide whether it is "appropriate" to have the Shell US Defendants, represented by one counsel only, cross-examined or do an examination in the nature of direct examination. In this jurisdiction, where the interest of a party is closely aligned with that of a witness, it would usually not be "appropriate" to allow what has been referred to as "sweetheart" cross-examination. It is hoped that the United States counsel can agree on this issue.

**46**  The next request in the LOR is that the Official Court Reporter perform the duties referred to in Rule 13.46(1) above, which I have already indicated will be done. In addition, there is a request that the testimony be videotaped. That is not common practice in this jurisdiction. If it is common practice, according to the United States Federal Rules of Procedure and Practice, this Court will order that the videotaping be done. Also, as requested, the official transcript and videotape and any exhibits will be sent to the United States counsel for the Plaintiffs, as requested, as well as to the United States counsel for the Shell US Defendants and counsel for Shell Canada.

**47**  All of the reasonable disbursements of the examination will be paid by the Applicants, Richardson, Patrick, Westbrook & Brickman LLC and will include the cost of preparing a transcript, the cost of videotaping the evidence, the cost of reproducing the transcript and videotape for other counsel, the cost of the Official Court Reporter. In addition, if the Shell Canada representative loses remuneration while either preparing for or attending at the examination, that person will be fully indemnified upon proof that Shell Canada has not remunerated that person, for the preparation and attendance at the examination. Otherwise, the Shell Canada representative will receive a witness allowance in accordance with section 54(a) of the *Alberta Evidence Act*, as prescribed in the *Alberta Rules of Court* in Division 3 of Schedule B.

**48**  Shell Canada's counsel, at the LOR application, will be awarded party-party costs according to the *Alberta Rules of Court*, pursuant to Column 5 of Schedule C for preparation for and attendance in Court to argue the application, for the preliminary application with respect to the materials to be put before the Court, for the preparation of a brief for the application and for all reasonable disbursements incurred. That Bill of Costs will be prepared forthwith by counsel for Shell Canada, submitted to the Applicant for payment in advance of the examination, which sum shall be paid in advance of the examination. Shell Canada's counsel will also receive party-party costs for attendance at the examination pursuant to Column 5 of Schedule C of the *Alberta Rules of Court*. Those costs shall be paid and all other disbursements for the examination shall be paid prior to the release of the transcript and videotape to the applicant. All costs and disbursements may be determined by an assessment officer in accordance with the above direction if counsel are unable to agree.

**49**  All of the above is without prejudice to a further or amended LOR being presented in future to this Court.

N.C. WITTMANN C.J.Q.B.

**End of Document**